# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Judge David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 99 C 3417 | DATE | 3/26/2001 |
| CASE TITLE | Jones vs. Union Pacific RR | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

Plaintiff's Motion for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, this Court DENIES Jones's Motion for Summary Judgment [#15] in its entirety and grants Union Pacific's request for summary judgment. Any other pending motions are moot and terminated. This case is closed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 2 8 2001 date docketed | |
| ✓ | Docketing to mail notices. | | | 57 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| mrl | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| GLEN JONES | ) |
| Plaintiff, | ) |
| | ) No. 99 C 3417 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| UNION PACIFIC RAILROAD, | ) |
| Defendant | ) |

## MEMORANDUM OPINION AND ORDER

Glen Jones is a former employee of the Union Pacific Railroad. He has sued Union Pacific for: (1) racial discrimination in his job assignments; (2) racial discrimination in his termination; and (3) retaliation for complaining about his job assignments. Jones has sued under both Title VII of the Civil Rights Act of 1964 and under Section 1981. Jones has now moved for summary judgment on all counts of his complaint. For the reasons stated below, this Court DENIES Jones's motion in its entirety. And, because the undisputed evidence shows that Union Pacific is entitled to judgment as a matter of law, the Court grants summary judgment in its favor.

### Introduction

Glen Jones worked for the Union Pacific Railroad Company or the Chicago and North Western Transportation Company (Union Pacific's predecessor prior to their merger in 1995) from 1980 until May 15, 1998. Union Pacific hired Jones as a coach cleaner of commuter railroad cars. After working the required number of days as an apprentice carman, Union Pacific promoted Jones to carman and established a seniority date of September 2, 1989. Jones's promotion came less than four months after being reinstated on a leniency basis after being dismissed for insubordination in December of 1988.

While Jones was working as a carman, he made several complaints about his work assignments to officials at Union Pacific and to individuals in his union. In a May 6, 1996, letter to Union Pacific general foreman Patricia Mitchell, Jones complained that David Rehr worked indoors repairing train car doors while Jones had to work outside. According to the letter, Jones had also raised this complaint with his foreman, Richard Ochnicki. Mitchell recommended that Jones talk to Stan Rickertsen, who was the director of the "Cal Avenue yard," where Jones worked. Jones did not talk to Rickertsen, but instead wrote to Rickertsen's supervisor, Rick Laue. Laue responded to Jones's letter on September 23, 1996, stating that jobs were assigned based on the employee's ability and skill in performing the work.

Jones also complained to Ron Burns, who was Union Pacific's president when he received Jones's letter on October 24, 1996. In this eight-page letter, Jones complained again about the assignments as compared to Rehr's. Jones's letter did not specifically complain about race discrimination. Later in 1996, the railroad ombudsman contacted Commuter Operations concerning Jones's complaint regarding job assignments. Laue responded that jobs were assigned based on employee's skills. On November 20, 1996, the Union Pacific ombudsman, René Orosco responded to Jones's complaints and asked Jones to call him. Jones called Orosco, but apparently nothing ever came of this conversation or of Jones's complaints.

Jones also complained about his assignments to his union officials. In 1996, he complained to local chairman Len McClendon and to his assistant Julian Sykes. In 1997, Jones complained about impending renovations of the employee locker room that he thought would impact his ability to change clothes at work. Jones thought this change to be a violation of the union contract. Jones ultimately complained to the union's general chairman in Arkansas regarding the locker room situation. Finally, in early 1998, Jones complained to his new union local chairman, Ken Maher.

Jones's complaint to Maher also related to his work assignments. Maher told Jones that he would investigate the complaint. It is unclear whether Jones and Maher had any follow-up conversations.

On April 28, 1998, Jones completed his scheduled work day at 4:30 p.m. What happened after he left work is contested. This is Jones's version of what happened: When his shift ended, he walked across the tracks and was about three tracks from the edge of the Union Pacific property when he noticed a white utility vehicle. Officer Chad Brody was working surveillance in the coach yard that evening. According to Brody's report, he saw a "black male wearing a knit hat and soiled clothing which is typical of the trespassers that frequent the yard."[1] Brody approached Jones and asked why he was in the coach yard. Jones explained to Brody that he worked for Union Pacific and that he had an identification card to prove it.

Brody asked to see Jones's ID. Jones took the ID from his pocket and handed it to Brody. Brody looked at the ID, passed it back to Jones and told Jones that he "did not have to say it like that." Jones apparently denied taking a negative tone in his conversation with Brody. Brody then accused Jones of "trying to be smart." Jones did not respond. Brody then told Jones that he could go. Brody also stated that he would not hit Jones.

When Jones reached the sidewalk adjacent to the Cal Avenue yard, Brody approached him and told him that they should go together to see King Carthans, Jones's. Jones ignored Brody and kept walking. Brody then told Jones that he was going to jail and that Jones would lose his job. Again, Brody asked to see Jones's ID. Jones showed the ID to Brody. For a second time, Brody asked Jones to get in his car to see Carthans. At about this time, a resident who knew Jones came

---

[1] This quotation is taken from Jones's reply brief at 3 n.2. It differs slightly from the statement in Jones's Rule 56.1 statement of facts, compare Rule 56.1 statement ("the black male wearing a knit hat and soiled clothes was typical of the trespassers that frequent the yard") but the Court is unable to verify which version is correct because Jones has not provided in full the report from which the quote is taken. For this motion, the difference is immaterial.

-3-

down to street level and yelled to Brody that Jones works at the Cal Avenue yard. Jones told the resident that Brody was a racist police officer and asked the person to call the Chicago police.

When the Chicago police arrived, Jones showed them his Union Pacific ID card. Jones told the police officers that the Union Pacific police officer was harassing him and that he was concerned for his safety because Brody had a gun. Brody subsequently called Senior Special Agent Bruce Finger, who arrived a few minutes after the Chicago police arrived. Jones showed Finger his ID. After asking for his ID back three times, Finger took Jones's Union Pacific ID and his state ID[2] to the supervisor in the coach yard.

Union Pacific's version of the facts and the version provided by the Union Pacific police officers, is somewhat different than Jones's version – to put it mildly. According to Union Pacific, Jones worked until 4:30 p.m. and then went to his locker. He left the shop around 5:00 p.m. and began walking across the numerous tracks at the Cal Avenue yard.

When Jones was approximately three tracks from the edge of the yard, Brody spotted and stopped Jones. Brody asked Jones what he was doing in the rail yard. Jones responded "[w]hat is the problem, motherfucker. I am an employee of the railroad." Jones also said to Brody "[l]ook you white motherfucker, I have my ID right here." Jones then flashed the ID holder in front of Brody's face. After Brody again asked to see Jones's ID, Jones handed it to Brody but then quickly took it back before Brody could read it. This verbal confrontation took place on the railroad yard.

Upon spotting Jones, Brody radioed his supervisor, Special Agent Finger. Brody radioed a second time to ask that Finger come to the scene because Jones was becoming abusive and angry. A third time, Brody radioed Finger and told him that he was leaving the scene because he was concerned for his safety.

---

[2] It is not clear how, according to Jones, Finger got Jones's state ID.

Finger and officers of the Chicago Police arrived at approximately the same time. Finger asked the Chicago police for Jones's ID card. Jones never asked Finger to return his state ID and in fact, Finger never knew that he had Jones's state ID in addition to Jones's Union Pacific ID. Finger then offered to drive Jones to the yard to discuss the matter and try to resolve it. At this suggestion, Jones asked the Chicago police officers whether he had "to get in this motherfucker's car."

Union Pacific has a discipline policy known as the Upgrade policy. Upgrade generally provides for progressive discipline ranging from written reprimands for Level 1 offenses, to sixty-day suspensions for Level 4 offenses, and dismissal for Level 5 offenses. Union Pacific's General Code Rule 1.6 prohibits employees from behaving in a manner defined as insubordinate or quarrelsome. Violations of Rule 1.6 are considered Level 5 violations.

The Upgrade's glossary defines "insubordinate" and "quarrelsome." Preliminarily, the glossary states that "[t]he following definitions, while not all inclusive or absolute, are intended to guide the determination of whether various acts by Employees meet necessary criteria to be considered a violation of applicable Level 5 Rules." According to Upgrade, employees are insubordinate when their "actions or statements indicate a refusal to carry out the clear instruction of a supervisor . . . or when an Employee demonstrates gross disrespect towards a supervisor." An employee is quarrelsome when their "continued behavior is inclined or disposed towards angry verbal confrontation with others in the work place."

On April 30, 1998, Jones was charged with being both insubordinate and quarrelsome for the April 28, 1998, incident. Union Pacific also notified Jones that it was terminating him. A disciplinary investigation convened on May 7, 1998. At the investigation, two union representatives appeared on Jones's behalf along with Jones. The union representatives were permitted to cross

examine witnesses who testified against Jones and to present evidence on his behalf. Jones did not call any witnesses. Greg Larson, the Superintendent of Commuter Operations, and Richard Laue, Director-Mechanical for Commuter Operations, reviewed the transcript of the investigation and concluded that the special agents' version of the facts was more credible. They determined that Jones was insubordinate and quarrelsome. Larson then approved Jones's dismissal. On May 15, 1998, Union Pacific terminated Jones following an incident that occurred after work on April 28, 1998. Union Pacific found that Jones violated company rules that prohibit insubordination and quarrelsome behavior.

### Analysis

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. See Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995). The Court will enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial," Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "It is well settled that a district court may enter summary judgment for the nonmoving party even in the absence of a cross motion if it finds that there are no material issues of fact and that the nonmoving party is entitled to judgment as a matter of law." Dyer v. Blair, 390 F. Supp. 1291, 1309 n.36 (N.D. Ill. 1975) (citing 6 J. Moore, Federal Practice § 56.12, at 2242-2243 (1974); 10 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2720, at 467-470 (1973)).

## Discriminatory Assignment of Job Duties

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts [to the same extent as] is enjoyed by white citizens." 42 U.S.C. 1981. "While section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." Suarez v. General Fire Extinguisher Co., 93 C 1194 at *6 (N.D. Ill. Sept. 18, 1995) (citing Von Zuckerstein V. Argonne National Lab., 984 F.2d 1467, 1472 (7th Cir. 1992)).³

A plaintiff can satisfy his burden of proving intentional discrimination in two ways: (1) through direct evidence of discriminatory intent; or (2) through circumstantial evidence and burden-shifting method articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Pasqua v. Metropolitan Life Ins. Co., 101 F.3d 514, 516 (7th Cir.1996). Under the direct method of proof, a plaintiff may introduce direct or circumstantial evidence of discrimination. See Troupe v. May Department Stores Co., 20 F.3d 734, 736 (7th Cir.1994). Direct evidence is that which can be interpreted as an acknowledgment of the defendant's discriminatory intent, while circumstantial evidence is evidence that can provide a basis for drawing an inference of intentional discrimination. Id. With respect to his first claim, Jones relies only on the indirect, burden-shifting method of proof.

---

³ Union Pacific moved for summary judgment on Jones's Title VII claim for discriminatory allocation of job duties. It says that he didn't include this claim in his EEOC charge. Jones doesn't dispute this but says he still has a cause of action under Section 1981. The Court will grant Union Pacific's request with respect to Jones's Title VII claim and analyze this aspect of his complaint under Section 1981, which does not require a pre-complaint filing with the EEOC.

Under the first step of the McDonnell Douglas test, plaintiffs must establish a *prima facie* case, consisting of the following four elements:

1. membership in a protected class;
2. satisfactory job performance;
3. suffering adverse employment action; and
4. more favorable treatment of similarly situated employees.

Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1132 (7th Cir. 1994). "Only by establishing these elements does the plaintiff shift the burden to the defendant (the second step) to articulate a legitimate, nondiscriminatory reason for its employment action." Jack v. City of Chicago, No. 98 C 8087, 2000 WL 705981 at *2 (N.D. Ill. May 22, 2000). If the defendant articulates such a reason, then the burden shifts back to the plaintiff (step three) to show that the reason is pretextual. See Courtney v. Biosound, Inc., 42 F.3d 414, 418 (7th Cir.1994). Although Union Pacific did not respond directly to Jones's motion for summary judgment with respect to the Section 1981 claim for discriminatory allocation of job duties, other aspects of its response show that Jones has failed to produce evidence from which a jury could conclude that Union Pacific's legitimate non-discriminatory reason for allocating the job duties as it did, was a pretext for unlawful discrimination.[4]

Union Pacific says that it chose Rehr – and other black and white workers – to work on doors based on the daily needs and the relative skills of the workers, regardless of their race. Jones has not offered any evidence that would suggest that this reason is pretextual. A pretext is literally a lie – "a phony reason for some action." Russell v. Acme-Evans, Co., 51 F.3d 64, 68 (7th Cir.1995). To

---

[4] Because Union Pacific did not respond directly to Jones's motion in this regard, the Court does not make any determination with respect to Jones's ability to satisfy the *prima facie* case. Instead, satisfaction of the *prima facie* case is assumed to address the pretext element.

satisfy this element of a discrimination case, a plaintiff may show directly that a discriminatory reason more likely motivated the employer or show indirectly that the defendant's asserted reasons are unbelievable, permitting an inference that the real reason was discriminatory. See Essex v. United Parcel Service, Inc., 111 F.3d 1304, 1310 (7th Cir.1997).

Jones hasn't made such a showing. He simply says that he wasn't picked to be trained to work on doors. According to Union Pacific the criterion used to select people to work on doors is an aptitude for door-fixing. Jones has not shown directly that discrimination was more likely the selection criterion for this training or indirectly shown that this selection criterion was a sham. The record is completely devoid of evidence regarding the skills necessary to fix doors or what even is entailed in fixing doors. Jones has certainly not shown that he had more door-fixing aptitude than Rehr or that he was a better door-fixer than Rehr or any of the other black or white door fixers. Jones does not dispute Union Pacific's assertion that both black and white employees worked on doors. In light of Jones's failure to show that Union Pacific's reasons for assigning door-fixing duties were pretextual, the Court DENIES Jones's motion for summary judgment. Additionally, the Court finds that on the undisputed facts, Union Pacific is entitled judgment as a matter of law and therefore GRANTS summary judgment to Union Pacific.

### Discriminatory Discharge

Jones's claim for discriminatory discharge also fails because he has not shown that Union Pacific's reason for firing him – insubordination – was a pretext for race discrimination.[5] As noted

---

[5] Officer Brody's description of Jones as a "black male" is not direct evidence of discriminatory intent. See, e.g., Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 348 (7th Cir. 1997). Even Jones's misquote of Brody cannot bootstrap a neutral description to an embodiment of racial prejudice and stereotype. Compare Pl.'s Rply. at 3 (attributing this quote to Brody: "black male wearing a knit hat and soiled clothing was *typical of the criminals* who trespass . . .") with Id. at 3. n.2 (acknowledging the actual quote: "the black, male was wearing a knit hat and soiled clothing *typical of the trespassers* . . .") (emphasis added).

above, to show pretext, Jones must show that the reason that Union Pacific gave for firing him – insubordination – was not the real reason. The Seventh Circuit has often stated that "the employer only needs to supply an honest reason, not necessarily a reasonable one," Flores v. Preferred Technical Group, 182 F.3d 512, 516 (7th Cir. 1999), but also recognizes that "a determination of whether a belief is honest is often conflated with an analysis of reasonableness." Id. Thus in addition to permitting plaintiffs to show that the proffered reason is not the "real reason," courts often also say that pretext can be proven circumstantially by showing either that the defendant's reason had "no basis in fact." Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1133 (7th Cir. 1994) (citation omitted). A plaintiff may also show that the reason would be "insufficient to warrant the discharge." Id.

According to Jones, there are two reasons that insubordination is a pretextual basis for his termination. First, Jones says that under the terms of Union Pacific's policy, he was not insubordinate. Second, Jones says that he was not insubordinate without regard to Union Pacific's insubordination policy. Contrary to Jones's assertion, the facts surrounding the April 28th incident are very much in dispute. See Def.'s Local Rule 56.1(b)(3(A) ¶¶ 55-66 (disputing each and every paragraph that plaintiff claims to be undisputed). The disputed facts, though, are not material. Even viewing the facts most favorably to Jones, he has not shown pretext. Jones disputes the officer's account of the events that lead to his termination. But he has not shown that the Union Pacific decision makers really believed him but credited Brody's description to cover for its discrimination.

Jones attempts to show pretext by arguing that his conduct was "insufficient to warrant the discharge." Lenoir, 13 F.3d at 1133. Jones says that – even assuming he did what Union Pacific says he did – the alleged conduct doesn't qualify as insubordination under the Union Pacific policy. According to Jones, the alleged conduct couldn't be insubordinate because Brody was not Jones's

supervisor. Jones has not shown, however, that Union Pacific's violated its own policy, cf. Huff v. Uarco, 122 F.3d 374, 380 (7th Cir. 1997) (showing that a defendant violated its own policy is evidence of pretext), or that Union Pacific's construction of its own policy was so unreasonable so as to suggest pretext.

The glossary in Upgrade defines "insubordination" as follows:

> When an Employee's actions or statements indicate a refusal to carry out the clear instructions of a supervisor (as opposed to a failure for cause) which are work, safety, or policy-related and which conform to accepted Company and industry practice, or when an Employee demonstrates gross disrespect towards a supervisor.

Although Upgrade does not define "supervisor," common dictionary definitions define the term broadly to include anyone with direction or control over others. See, e.g., Black's Law Dictionary 1438 (6th Ed. 1990); see also United States v. King, 21 F.3d 1302, 1305 (3rd Cir. 1994) (citing Black's Law Dictionary).

Union Pacific security officers certainly had direction and control over others within their sphere of influence. Officer Brody appeared to be exercising his direction and control when he asked Jones for his ID. According to Union Pacific, Upgrade has been interpreted and applied so that even people who are not actually supervisors are treated as such under the policy. Also, Union Pacific says that all security officers are considered superiors. Jones has not refuted these assertions

Further undermining Jones's position is the fact that Upgrade prefaces its section on insubordination by saying that the criteria listed are not "all inclusive or absolute" but merely intended "to guide the determination of whether various acts" are considered violations. Thus Union Pacific has built into its policy the flexibility to broadly define terms to advance its interests. Under the circumstances, Union Pacific's application of its policy is a reasonable one. And, as courts within the Seventh Circuit have stated for years, courts do not sit as "super-personnel department[s] to second guess an employer's business decisions." Dale v. Chicago Tribune Co., 797 F.2d 458, 464

(7th Cir. 1986) (internal marks omitted). Jones has not shown that Union Pacific's interpretation of its own policy actually violates the policy. In sum, Jones has not raised a triable issue of pretext.

Finally, although Jones denies acting in the manner that Brody and Finger have described, he has not presented any evidence to show that Union Pacific believed his version but fired him anyway. The factual dispute is not so lopsided so as to provide an inference that Union Pacific is lying when it says that it believed Brody and Finger. Jones has not provided any evidence that Union Pacific "rubber stamped" the security officer's version of the facts either in this case or in general. In short, he has not shown that insubordination was a pretext for race discrimination. Even viewing the evidence in the light most favorable to Jones, Union Pacific, not Jones, is entitled to judgment as a matter of law.

## Retaliation

Title VII also prohibits employers from retaliating against an employee for exercising her right to pursue discrimination claims. See 42 U.S.C. S 2000e-3(a) (prohibiting "discriminat[ion] against any [employee] ... because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under [Title VII]"); Eiland v. Trinity Hosp., 150 F.3d 747, 753 (7th Cir.1998). To establish a *prima facie* case in a retaliation action, Jones must show that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) the protected activity is causally linked and the adverse action. See Johnson v. City of Ft. Wayne, Ind., 91 F.3d 922, 938-39 (7th Cir.1996).

For purposes of this motion, the Court assumes that Jones has satisfied the first two elements of the *prima facie* case for retaliation. His motion must be denied – and indeed summary judgment is appropriate for Union Pacific – because the third element is lacking as a matter of law. To satisfy this element of the *prima facie* case, Jones must show that Union Pacific "would not have [fired him]

'but for' [him complaining about the assignment of job duties]." Adusumilli v. City of Chicago, 164 F.3d 353, 363 (7th Cir. 1991). One way to show a causal link is to show close temporal proximity. Ordinarily, the adverse action of the employer must closely follow closely "on the heels" of the protected expression to create the inference of a causal connection. See, e.g., Suarez v. General Fire Extinguisher Corp., No. 93 C 1194, 1995 WL 560934, *12 (N.D.Ill. Sept.18, 1995) (three-month gap between expression and termination did not support an inference of retaliation); Trahant v. Royal Indem. Co., No. 95 C 564, 1996 WL 420282, *8 (N.D.Ill. July 25, 1996), aff'd, 121 F.3d 1094 (7th Cir.1997) (three to four month lag, absent other relevant circumstances, was too long to support an inference of causation). "[A]s the temporal distance between the protected expression and the adverse action increases, it is less likely that there is a causal link between the two events." McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 797 (7th Cir. 1997) (internal marks omitted).

To supply a temporal connection between his complaints and his termination, Jones relies on his affidavit, which states that he complained about his work assignments from sometime in 1995 through February 1998. The time lapse between this February date and the date in May 1998 on which he was discharged would put this case in the range that might permit an inference of causation to be drawn. To get to the February 1998 date, however, Jones points to complaints that he made to his union representatives, not to Union Pacific. Jones does not offer any evidence that the union representatives relayed his complaints to Union Pacific. And, Union Pacific has stated that it is unaware of any complaints that Jones made to his union representatives. Jones also does not offer any legal reason to require an inference that telling the union representatives would require imputing knowledge to Union Pacific. On this record – even in a light most favorable to Jones – the most recent complaint about which Union Pacific was aware took place sometime in 1996, more than a year before he was discharged for insubordination. This gap in time is too wide to support an

inference of causation. Suarez, supra, at *12. Even taking drawing all inferences in Jones's favor from the undisputed evidence, Union Pacific, not Jones is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, this Court DENIES Jones's motion for summary judgment in its entirety. Additionally because Union Pacific is entitled to judgment as a matter of law on all counts, even viewing the evidence in the light most favorable to Jones, the Court enters judgment in Union Pacific's favor on those counts.

Enter:

_____
David H. Coar
United States District Judge

Dated: MAR 2 6 2001